FILED
2014 Nov-12  PM 01:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JEFFREY WALKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-13-S-52-NE** |
| | ) | |
| **SCHWARZE INDUSTRIES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDERS

This action was brought by Jeffrey Walker against his former employer, Schwarze Industries, Inc.  Walker asserts claims for race discrimination, retaliation, and a retaliatory hostile work environment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and 42 U.S.C. § 1981.[1]  The case presently is before the court on the defendant's motion for summary judgment and motion to strike portions of the affidavit submitted by plaintiff in opposition to summary judgment.[2]  Upon consideration of the pleadings, briefs, and evidentiary submissions, this court concludes that the motion to strike should be denied, and the motion for summary judgment should be granted in part and denied in part.

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 25 (Motion for Summary Judgment) and doc. no. 37 (Motion to Strike).

1

# I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  MOTION TO STRIKE

Defendant's motion to strike attacks numerous statements contained in plaintiff's opposition affidavit.  Defendant argues that three statements are not admissible because Walker lacked personal knowledge of the matters about which he testified.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony . . . .") (ellipses supplied).  For example, defendant moves to strike Walker's statement that his direct supervisor, Don Neal, "seemed to offer voluntary overtime work to Tony Payne (Caucasian) and James Eaton (Caucasian) first and would not give me the same opportunity to work or turn it down."[3]  Defendant

---

[3] Doc. no. 32-1 (Walker Affidavit), ¶ 13.  The paragraph from which the sentence quoted in text was copied reads as follows:

> 13.  During April 2011, I complained about the way Neal assigned overtime to the employees in the Fabrication department.  I specifically complained to Neal

contends that "[t]here is no foundation provided to show why it 'seemed' that Neal offered overtime opportunities to Caucasian employees."[4]   However, defendant ignores Walker's deposition testimony that he personally observed Don Neal offer overtime work to Tony Payne and James Eaton, but not to him, on at least one occasion.[5]  Thus, defendant's objection affects the weight, but not the admissibility, of that statement.  Further, Don Neal's own affidavit confirmed that Tony Payne and James Eaton generally were offered more overtime than Walker.[6]   Accordingly, defendant's motion to strike that statement is due to be denied.

Defendant next asks the court to strike Walker's affidavit statement that "Garcia refused to look at the video which I knew would show how mad and threatening Don Neal was when he yelled at me on the work floor."[7]  Defendant does not explain why

---

(Caucasian) and to Production Manager Wes [Bryant] (Caucasian) that I thought Neal was discriminating against me because of my race.  Neal seemed to offer voluntary overtime work to Tony Payne (Caucasian) and James Eaton (Caucasian) first and would not give me the same opportunity to work or turn it down.

*Id.* at 5-6 (alteration supplied).

[4] Doc. no. 37 (Motion to Strike)*,* at 5 n.3 (alteration supplied).

[5] *See* doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 236–37.

[6] Doc. no. 27-11 (Defendant's Exhibit "F" (Neal Declaration)), ¶ 7.

[7] Doc. no. 32-1 (Walker Affidavit), ¶ 51.  The paragraph from which the sentence quoted in text was copied reads as follows:

51.  On July 3, 2012, Gabriel[a] Garcia visited the Huntsville location and conducted the corporate investigation which concluded that my complaints lacked merit.  Garcia interviewed many of the same people Kevin Lozen and Kyle Lausee interviewed a few days before.  On the day Garcia visited, Don Neal came to the department and gathered up the employees who were being interviewed prior to the

Walker lacks personal knowledge of that incident,[8] and it is obvious that he did. Accordingly, defendant's motion to strike that statement also is due to be denied.

Defendant next objects to Walker's testimony that "Lozen was hostile and aggressive and yelling at me which caused me to feel threatened."[9]  That statement was made in the following context:

> 58.  On July 12, 2012, [Plant Manager] Kevin Lozen came to my work station and confronted me where I was working and kept talking to me.  I tried to retreat from the conversation and to just do my job, but Lozen kept coming at me.  Lozen was hostile and aggressive and yelling at me which caused me to feel threatened.  Eventually I turned to face Lozen, who pushed me in the shoulder hard enough for me to flinch.[10]

Once again, defendant does not explain the basis for its contention that Walker lacks personal knowledge of the event he describes.  Clearly he does, and it is permissible for him to characterize Lozen's behavior, and his own, subjective reaction to the behavior.  Again, therefore, defendant's motion to strike that statement is due to be denied.

---

> interviews with Garcia.  Garcia only met with me once.  By that time, she had already interviewed all of the other employees and refused to consider issues I raised during my interview.  Garcia refused to look at the video which I knew would show how mad and threatening Don Neal was when he yelled at me on the work floor. Garcia said that she didn't have time since she was only there for that one day.

*Id*. at 20-21 (alteration supplied).

[8] *See* doc. no. 37 (Motion to Strike), at 10.

[9] Doc. no 32-1 (Walker Affidavit), ¶ 58.

[10] *Id*. at 22-23 (alteration supplied).

Finally, defendant asks the court to strike Walker's testimony that "Neal used the new overtime system at first, but later he got away from the sheet and went back to offering overtime informally to Tony Payne (Caucasian) and James Eaton (Caucasian),"[11] arguing that it is contradicted by Walker's deposition testimony.[12] Defendant relies upon the "sham affidavit" rule, which prevents a party from submitting affidavit testimony that "merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Defendant cites the following colloquy from Walker's deposition:

> Q:     Okay. So after October 11th, 2001, your testimony is to the extent you wanted to work overtime, you were able to do that?
>
> A:     Yes, sir.
>
> Q:     So the system Mr. Bryant came up with was able to address the concerns you had back in October about favoritism and, as you said discrimination?
>
> A:     Yes, sir.

Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 235. Defendant's argument ignores Walker's deposition testimony that "Don Neal . . . didn't go by the sheet that Mr. Wes Bryant put out. Only certain times he went by that sheet."[13]

---

[11] *Id.*, ¶ 20.

[12] *See* doc. no. 37 (Motion to Strike), at 17.

[13] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 245.

Walker's deposition also reiterates that the sheet "was passed around sometimes, and then [Neal] got away from the sheet."[14]  Thus, Walker's affidavit does not contradict, but actually affirms his deposition testimony.

Those are the only portions of plaintiff's affidavit that have been taken into account by this court when considering the motion for summary judgment that is addressed in the remainder of this opinion.  Accordingly, all other parts of defendant's motion to strike are due to be denied as moot.

## III.  FACTS

Schwarze Industries, Inc., manufactures truck-mounted parking-lot and street sweepers.[15]  Plaintiff, Jeffrey Walker, is an African-American.[16]  He was hired during April of 2006 to work as a "press brake operator" on the third shift in the fabrication department of Schwarze's Huntsville, Alabama plant.[17]  Walker's direct supervisor, Don Neal, was a Caucasian ("white").  He promoted Walker to a "leadman" position (*i.e.*, lead press brake operator) on July 31, 2006, about three months after his initial

---

[14] *Id.* at 246 (alteration supplied).

[15] Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 22–24.

[16] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 26.  Walker is a resident of Huntsville, Alabama.  *Id.* at 11.

[17] The press brake is a piece of equipment that "takes a flat sheet of metal and allows [workers] to put bends in it so that it forms different shapes." *Id.* at 34 (alteration supplied).  The fabrication department cuts "sheet metal and forms it, and then sends it on to the welding department."  Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 24.

hire.[18]

During Walker's employment with Schwarze, he operated a small business on the side ("Personal Touch Lawn Care Service").[19]  At some undisclosed point during 2006, Neal told Walker that he would be moved from the third to the second shift, and that the move would not interfere with his lawn care business.[20]  Schwarze eliminated the second shift in December of 2008, however, and Walker was moved to the first shift.[21]  When the second shift was reinstated two and a half years later, during May of 2011, Walker was moved back to his former position on the second shift.[22]

## A.   Don Neal's Treatment of Walker Compared to White Leads

Walker was the only African-American leadman in the fabrication department. The other leads — Ivan Hutto, John Gusich, and William Harris — were white.[23]  Don Neal supervised all leadmen.[24]

Plaintiff alleges that, beginning in December of 2008, when Schwarze eliminated the second shift and Walker was moved to first shift, Neal subjected him

---

[18] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 91–92, 105; doc. no. 27-2 (Defendant's Exhibit "A(1)" (Notice/Record of Discussion)); *see also* doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 28.

[19] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 84.

[20] *Id.* at 97.

[21] *Id.* at 93–94, 101.

[22] *Id.* at 101–02.

[23] *Id.* at 106–07; doc. no. 32-1 (Walker Affidavit), ¶ 2.

[24] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 21, 107.

to less favorable treatment than the white leads.  For example, Neal did not permit Walker to give instructions and guidance to hourly employees, whereas he permitted the white leads to do so.[25]  Walker also was the only leadman in his department to whom Neal did not allow free access to certain equipment.  Instead, Walker had to "go to another Caucasian lead to get those accesses."[26]  Moreover, Walker was not given a key to the building until sometime after the white leads had received them.[27] Furthermore, when Neal prepared to leave on personal vacations, he always selected a white lead to serve as acting supervisor in his absence.[28]  Neal also directed white leads to deliver orders to Walker, but he never asked Walker to deliver orders to the white leads.[29]  Finally, Neal invited only white leads in the fabrication department to production meetings, which were "supposed to be for all department heads and the leads."[30] It should be noted, nevertheless, that Chris Moore, an African-American lead in the welding department, *was invited* to production meetings.[31]

## B.    Walker's April 2011 Overtime Complaint

---

[25] *Id.* at 134–35.

[26] *Id.* at 138.

[27] Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 134–36.  Neal testifies that William Harris had his key for "quite a while," but that Ivan Hutto received his key "just in the last recent few years."  *Id.*  Walker received his key on May 9, 2011.  *Id.*; doc. no. 27-6 (Defendant's Exhibit "C(27)" (May 9, 2011 Notice/Record of Discussion)).

[28] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 139.

[29] *Id.* at 170.

[30] *Id.* at 144.

[31] *Id.* at 146.

Walker complained that Don Neal was offering more voluntary overtime to two white employees in the fabrication department (*i.e.*, James Eaton and Tony Payne) than he offered to Walker during a meeting with Neal and Production Manager Wes Bryant during April 2011.[32]  Walker stated that he believed Neal was "discriminating against him because of his race."[33]  After the meeting, Neal privately told Walker: "[You] shouldn't have went [*sic*] to Wes, I despise that man, that is the biggest mistake you made.  And Wes don't [*sic*] run the fab shop, I do."[34]

## C.   Walker's October 2011 Overtime Complaint

Several months later, "[o]n or about October 28, 2011," Walker again complained during a meeting with Don Neal, Production Manager Wes Bryant, and Human Resources Manager Kyle Lausee that Neal's method of assigning overtime was racially discriminatory.[35]  According to a memorandum of that meeting signed by Walker, Bryant, and Lausee, "[Walker] said he wanted to state that this was obvious

---

[32] *Id.* at 239–40; doc. no. 32-1 (Walker Affidavit), ¶ 13.

[33] Doc. no. 32-1 (Walker Affidavit), ¶ 13.

[34] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 245 (alterations supplied).  Neal testified that he assigned voluntary overtime based upon his needs for the shift:

> If it was voluntary for multiple skill sets, you ask everybody, and you take the ones that want it.  If I needed only laser operators, I wouldn't call the whole group together and ask them about working the Saturday; I would talk to the laser operators about working the Saturday.

Doc. no. 27-5 (Defendant's Exhibit "C"(Neal Deposition)), at 141.

[35] Doc. no. 32-1 (Walker Affidavit), ¶ 16 (alteration supplied).

favoritism, and that the company had a policy against favoritism *and desegregation* [*sic*]."[36] The memo described a new policy for assigning voluntary overtime that was supposed to be implemented immediately: *i.e.*, a sign-up sheet was to be posted in an area accessible to all employees whenever voluntary overtime shifts were available.[37]

### D.     October 28, 2011 Reprimand

Don Neal issued a reprimand to Walker later on that same day, *after* Neal and Bryant had agreed to change the policy, for "complain[ing] to hourly team members about the decision on overtime."[38] The reprimand stated that Walker's complaints had caused "a disruption in the work place."[39] Walker wrote in the "Employee Comments" section that he felt that the reprimand had been issued in retaliation for his complaints about the overtime system "and also other incidents."[40]

Walker testified during his deposition that Neal adhered to the new overtime

---

[36] Doc. no. 27-2 (Defendant's Exhibit "A(6)" (October 28, 2011 Notice of Disciplinary Action)) (alterations and emphasis supplied). It should be noted that this notice was treated as a record of discussion. Doc. no. 27-9 (Defendant's Exhibit "E" (Lausee Deposition)), at 29.

[37] Doc. no. 27-2 (Defendant's Exhibit "A(6)" (October 28, 2011 Notice of Disciplinary Action)). Walker describes the old policy as a "tap on the shoulder" method.

[38] *Id.* (Defendant's Exhibit "A(7)" (October 28, 2011 Reprimand)) (alteration supplied); *see also* doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 155. Walker testifies that he "did not complain to the other employees after the new system was put in place." Doc. no. 32-1 (Walker Affidavit), ¶ 19.

[39] Doc. no. 27-2 (Defendant's Exhibit "A(7)" (October 28, 2011 Reprimand)).

[40] *Id.*

policy "only certain times" because, according to Walker, Neal "didn't have any respect for" Production Manager Wes Bryant.[41]  Neal eventually "went back to offering overtime informally," and Tony Payne and James Eaton were again offered more overtime than Walker.[42]  Thus, Walker complained once more to Neal during March of 2012 that he "was not offered overtime and . . . [that he, Walker,] wanted to work," but he "did not specifically complain that this was race discrimination."[43]

## E.    April 2012 Reprimand

On April 4, 2012 — five months after Neal's October 28, 2011 reprimand of Walker — Neal issued another reprimand to Walker for "[n]ot being productive" during his April 2nd shift.[44]  The reprimand stated that Walker had failed to follow specific orders, exhibited "no urgency or effort," and that his actions "caused a two hour delay in [the] weld department the next morning."[45]

Neal wrote the reprimand only after reviewing video footage of Walker's work during the April 2nd shift, because Neal had been on vacation on that date and, upon

---

[41] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 245.

[42] Doc. no. 32-1 (Walker Affidavit), ¶ 20.  Neal admitted that the two generally worked more overtime than Walker, but he attributed the discrepancy to the fact that Payne and Eaton were able to operate more machines than Walker.  Doc. no. 27-11 (Defendant's Exhibit "F" (Neal Declaration)), ¶ 7.

[43] Doc. no. 32-1 (Walker Affidavit), ¶ 21 (alteration supplied).

[44] Doc. no. 27-2 (Defendant's Exhibit "A(5)" (April 4, 2012 Notice of Disciplinary Action)) (alteration supplied); *see also* doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 165.

[45] Doc. no. 27-2 (Defendant's Exhibit "A(5)" (April 4, 2012 Notice of Disciplinary Action)) (alteration supplied).

his return, he had been told of Walker's poor performance by acting supervisor John Gusich.[46]

As a result of the reprimand, Walker was required to take a drug test, and was placed on probation for one year, during which time any "insubordination/failure to carry out reasonable job assignments, poor performance, [or] low productivity [would] result in demotion of lead position and lead pay."[47]

Walker wrote in the employee comments section that he felt the reprimand had been issued in retaliation for the "meeting held [in] October 2011": *i.e.*, the October 28, 2011 meeting with Don Neal, Production Manager Wes Bryant, and Human Resources Manager Kyle Lausee, during which Walker had complained that Neal's method of assigning overtime was racially discriminatory.[48]

At the conclusion of his April 4, 2012 meeting with Neal, Walker called his wife, who took him to an "Urgent Care" facility, because the allegations contained in the reprimand and the stress of the meeting had made his "blood pressure go sky high."[49]

---

[46] Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 167; doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 294–95.

[47] Doc. no. 27-2 (Defendant's Exhibit "A(5)" (April 4, 2012 Notice of Disciplinary Action)) (alterations supplied).

[48] *Id.* (alterations supplied). *See also* doc. no. 27-2 (Defendant's Exhibit "A(6)" (October 28, 2011 Notice of Disciplinary Action)).

[49] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 311.

**F.   Walker's April 5, 2012 Letter to Human Resources Manager Kyle Lausee**

Walker denied that he had engaged in the misconduct described in Neal's April 4th reprimand in a letter addressed to Human Resources Manager Kyle Lausee the following day.[50]   He charged that the reprimand was "strictly retaliatory" for the complaints he had lodged during the meeting held on October 28, 2011.[51]   Walker also listed several ways in which he believed that he had been treated differently, or unfairly, from other leads.[52]

Walker did not explicitly allege racial discrimination in his letter, but Lausee admitted that Walker's use of terms like "prejudice" and "equal opportunity" clearly carried "racial connotations."[53]

Walker's letter requested a meeting with the "Human Resources Manager" (Kyle Lausee), the "Plant Manager" (Kevin Lozen), and Schwarze's President (Howard May) in order "to discuss these matters further."[54]   No such meeting was held, however, and there is nothing in the record indicating that Lausee or any other employee of Schwarze conducted an investigation into the allegations contained in

---

[50] Doc. no. 27-2 (Defendant's Exhibit "A(8)" (April 5, 2012 Letter to Kyle Lausee)).  The allegations are supported by "Statements of Facts" written by John Gusich and William Harris on April 5, 2012.  *See* doc. no. 27-2 (Defendant's Exhibit "A(11)" ("Team Member Relations: Statement of Facts" of John Gusich and William Harris)).

[51] Doc. no. 27-2 (Defendant's Exhibit "A(8)" (April 5, 2012 Letter to Kyle Lausee)).

[52] *Id.*

[53] Doc. no. 27-9 (Defendant's Exhibit "E" (Lausee Deposition)), at 64.

[54] Doc. no. 27-2 (Defendant's Exhibit "A(8)" (April 5, 2012 Letter to Kyle Lausee)).

Walker's letter.[55]

## G.   Walker's April 9, 2012 Letter to Kyle Lausee, Kevin Lozen, and Howard May

Walker sent another letter challenging his April 4th reprimand four days after the preceding, April 5th letter.  The second letter was jointly addressed to Human Resources Manager Kyle Lausee, Plant Manager Kevin Lozen, and Schwarze's President, Howard May.  The letter explained the basis for Walker's belief that he was not at fault for causing a delay in the weld department on April 3rd.[56]

## H.   Walker's Transfer to First Shift

As noted in the introductory paragraphs to this Part of this opinion, Walker was originally hired to operate a press brake on the third shift, but was moved to the second shift at some undisclosed time during 2006.  When Schwarze eliminated the second shift during December of 2008, Walker was moved to the first shift.  The second shift was reinstated in May of 2011, however, and Walker then was moved back to his former position on that shift.  Nearly a year after being returned to the second shift, *i.e.*, on or about April 10, 2012, Walker was called into a meeting with

---

[55] In his deposition, Lausee testifies that he "looked into the overtime" accusation, but Lausee was confusing that investigation with the investigation of later, verbal accusations.  *See* doc. no. 27-9 (Defendant's Exhibit "E" (Lausee Deposition)), at 65; doc. no. 27-10 (Defendant's Exhibit "E(10)" (April 25, 2012 E-mail to Kyle Lausee)); doc. no. 27-2 (Defendant's Exhibit "A(12)" (April 25, 2012 Notice/Record of Discussion)).

[56] Doc. no. 27-10 (Defendant's Exhibit "E(9)" (April 9, 2012 Letter to Kyle Lausee, *et al.*)).

Human Resources Manager Kyle Lausee, Plant Manager Kevin Lozen, and his direct supervisor, Don Neal.  He was told by Lozen that he was being moved back to the first shift, in order to "improve [his] communication [skills]" and cross-train on other machines.[57]  Lozen said that the transfer was temporary, and that there would be a "reassessment" of the move after two weeks.[58]

At some undisclosed time after the two–week reassessment period had passed, Walker complained to Human Resources Manager Kyle Lausee about still being assigned to the first shift.[59]  Lausee investigated the complaint and concluded that it was "not warranted," because Walker had not met the expectations placed upon him when he was moved to the first shift, including improvement in the areas of "attitude," "teamwork," and "skills."[60]

Walker also complained that he had been "skipped over" in the assignment of an overtime shift on a Monday morning.[61]  Lausee investigated that complaint as well, but concluded that it also was "not warranted," because Walker had been off work, on

---

[57] Doc. no. 32-1 (Walker Affidavit), ¶ 26 (alterations supplied).  *See also* doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 187.  Lozen was responsible for moving Walker to the first shift.  Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 186.

[58] Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition)), at 191.

[59] *See* doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 331; doc. no. 27-2 (Defendant's Exhibit "A(12)" (April 25, 2012 Notice/Record of Discussion)).

[60] Doc. no. 27-2 (Defendant's Exhibit "A(12)" (April 25, 2012 Notice/Record of Discussion)).

[61]*Id.*  (Defendant's Exhibit "A(12)" (April 26, 2012 Notice/Record of Discussion)).

vacation, on the day during which the overtime assignments were offered.[62]

## I.   Walker's May 7, 2012 Complaints

Walker lodged several complaints on May 7, 2012.  He first mailed a letter to four employees in the corporate office of "Alamo Group, Inc.":  Ronald Robinson, James Skaggs, Geoffrey Davies, and Corporate Attorney Donald Duncan.[63]  (The positions held by the first three persons are not disclosed.)  The record does not clearly define the nature of the Alamo Group's relationship to Schwarze, but this court has ascertained through an internet search that the entity, headquartered in Seguin, Texas, appears to be Schwarze's parent company.[64]

In any event, Walker's letter complained about "unethical, discriminatory and retaliation practices" in the Schwarze plant.[65]  He alleged that his complaints had not been adequately addressed, and that Schwarze

> Management has taken this as an opportunity to trump up false information, and knit pick [*sic*] anything that occurs as a method to pile negative information into my personnel file without merit. . . .  Again, these accusations are all subjective opinions in an effort to "black-ball" me out of my position in retaliation.  This is all in retaliation [for] my inquiries regarding equal opportunity.

---

[62] *Id.*

[63] *Id.*  (Defendant's Exhibit "A(9)" (May 7, 2012 Letter to Ronald Robinson, *et al.*)).

[64] *See* ALAMO GROUP, http://alamo-group.com/Company/Member_Companies.html (listing Schwarze as a "Member Company") (last visited Oct. 9, 2014).

[65] Doc. no. 27-2 (Defendant's Exhibit "A(9)" (May 7, 2012 Letter to Ronald Robinson, *et al.*)).

This actually all started last year when 2nd shift beg[a]n.  Mr. Don Neal was opposed to having a 2nd shift and tried to coerce me with my response to upper management regarding my opinion of beginning a 2nd shift.  Upper management approached me with the idea[] of starting the shift and requested me to take on the position as Lead.  I agreed and this was not favored by Don.

The retaliations beg[a]n in August 2011. — Please see attached Letter #1 for details [*i.e.*, the letter describes an occasion when Don Neal asked Walker to work overtime on the day Walker was moving his daughter into her college dorm, and that request allegedly made Walker "feel like (he was) being forced to choose between (his) family and (his) job"[66]].

The next obvious retaliation occurred when I noticed Don was allowing his personal favorites (Tony Payne and James Eaton) to work numerous hours of overtime without affording the same opportunity to other employees with the same skill level.

Doc. no. 27-2 (Defendant's Exhibit "A(9)" (May 7, 2012 Letter to Ronald Robinson, *et al.*)) (alterations and footnote supplied).  Walker then referenced the April 4, 2012 reprimand and April 9, 2012 letter to Kyle Lausee *et al.*, discussed in Parts II.E. and G., *supra*.

The second complaint lodged by Walker on May 7, 2012 was contained in an "Intake Questionnaire" submitted to the Equal Employment Opportunity Commission,

---

[66] *Id.*  (Defendant's Exhibit "A(10)" (August 19, 2011 Letter to "Wes Bryant")) (alterations supplied); *see also* doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 386 (agreeing that Don Neal retaliated against Walker on this occasion because Walker would not argue against a second shift to upper management).

which alleged race discrimination and retaliation.[67]   In the section asking "What happened to you that you believe was discriminatory," Walker described two incidents: *i.e.*, "Called to the office [on May 2, 2012] for 2 Record[s] of Discussion[] for false accusations regarding communication and leadership";[68] and  "Received write-up [on April 24, 2012] regarding work performance."[69]  In the section asking for a description of other similarly-situated employees who were treated *differently*, Walker listed Tony Payne and James Eaton.[70]  In the section asking for a description of employees who were treated *the same*, he listed Chris Moore, an African-American lead, and Victor Garner, an African-American hourly worker.[71]  He wrote that Chris Moore was "[n]ot provided the same privileges as other Leads," and that Victor Garner was "[n]ot provided equal opportunity."[72]

---

[67] Doc. no. 27-2 (Defendant's Exhibit "A(9)" (EEOC Intake Questionnaire)), at 1–2 (indicating that the questionnaire was signed on May 3, 2012); doc. no. 32-1 (Walker Affidavit), ¶ 33.

[68] Doc. no. 27-2 (Defendant's Exhibit "A(9)" (EEOC Intake Questionnaire)), at 2 (alterations supplied); *see id.* (Defendant's Exhibit "A(12)" (April 25, 2012 and April 26, 2012 Notices/Records of Discussion)) (indicating that, although the notices are dated in April, they were signed on May 2, 2012).  In fact, these notices are merely the results of Lausee's investigations into Walker's complaints, and the only statement resembling an "accusation" in those documents is Lausee's recounting of the reasons Walker was moved to the first shift.  *Id.*

[69] *Id.* (Defendant's Exhibit "A(9)" (EEOC Intake Questionnaire)), at 2 (alteration supplied). Walker is unsure whether there was actually a write-up on April 24, 2012, or whether he was referring to the reprimand issued to him on April 4, 2012.  Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 338–39.

[70] Doc. no. 27-2 (Defendant's Exhibit "A(9)" (EEOC Intake Questionnaire)), at 2.

[71] *Id.* at 3.

[72] *Id.* (alterations supplied).

The third complaint submitted by Walker on May 7, 2012 was lodged electronically on a website named "MySafeWorkplace."[73]  The entity responsible for maintaining that website is independent of the Alamo Group, but accepts complaints lodged by employees of Alamo Group companies, either by telephone or through the "MySafeWorkplace" website.[74]  Whenever an employee lodges a complaint, an e-mail is transmitted to Donald Duncan, the Alamo Group's corporate attorney, and to an undisclosed member of the Alamo Group Board of Directors.[75]  The Alamo Group Human Resources Department determines whether to investigate the complaint.[76]

Walker's complaint labeled the "Incident Type" as "Retaliation,"[77] and in the "Description" section he included the text from his May 7, 2012 letter to Alamo Group,[78] his August 19, 2011 letter to Plant Production Manager Wes Bryant,[79] his

---

[73] Doc. no. 32-1 (Walker Affidavit), ¶ 34; doc. no. 27-2 (Defendant's Exhibit "B(1)" (May 7, 2012 MySafeWorkplace Incident Report)).  Interestingly, Don Neal had told Walker well before he made this complaint about another African-American employee, Victor Garner, who had complained to MySafeWorkplace.  Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 199.   Neal told Walker that Garner's act of complaining to MySafeWorkplace "was a big mistake," and that "he won't be at the company long."  *Id.*  Walker alleges that Garner was later terminated. *Id.* at 203.

[74] Doc. no. 27-3 (Defendant's Exhibit "B" (Garcia Deposition)), at 10–15 (alteration supplied).

[75] *Id.* at 13.

[76] *Id.*

[77] Doc. no. 27-4 (Defendant's Exhibit "B(1)" (May 7, 2012 MySafeWorkplace Incident Report)), at 2–4.

[78] Doc. no. 27-2 (Defendant's Exhibit "A(9)" (May 7, 2012 Letter to Ronald Robinson, *et al.*)).

[79] *Id.* (Defendant's Exhibit "A(10)" (August 19, 2011 Letter to Wes Bryant)).

April 5, 2012 letter to Human Resources Manager Kyle Lausee,[80] and an April 25, 2012 e-mail to Lausee.[81]

## J.    May 11, 2012 Performance Evaluation

Walker received an annual performance evaluation from Don Neal on May 11, 2012, four days after lodging the complaints described in the preceding section. Walker's evaluation was lower than any previous annual performance evaluation received by him during the six years he had been employed by Schwarze.[82]  Neal assigned Walker an overall rank of 2.57 on a performance scale where a value of 3 is considered "Satisfactory," and a value of 2 indicates that the employee "Needs Improvement."[83]  Walker's three previous scores of 3.0 in 2008,[84] 3.29 in 2009,[85] and 3.43 in 2010,[86] had consistently trended in the opposite direction:  *above* "Satisfactory."  Neal wrote in the evaluation's comments section that Walker needed "to work on communication skills with first shift lead and myself," and should not "have a negative attitude and look for reasons why the requirements [cannot] be

---

[80] *Id.* (Defendant's Exhibit "A(8)" (April 5, 2012 Letter to Kyle Lausee)).

[81] Doc. no. 27-4 (Defendant's Exhibit "B(1)" (May 7, 2012 MySafeWorkplace Incident Report)), at 5–6.

[82] Doc. no. 32-1 (Walker Affidavit), ¶ 38.

[83] Doc. no. 27-2 (Defendant's Exhibit "A(13)" (2011 Performance Review)).

[84] Doc. no. 27-6 (Defendant's Exhibit "C(16)").

[85] *Id.*  (Defendant's Exhibit "C(19)").

[86] *Id.*  (Defendant's Exhibit "C(20)").

[met]."[87]  The lower score meant that Walker would receive "a smaller raise than if [he] had been given a performance review which was consistent" with his previous annual performance evaluations.[88]

**K**.    **May 11, 2012 Notice/Record of Discussion**

Walker met with his Direct Supervisor, Don Neal, Human Resources Manager Kyle Lausee, and Plant Manager Kevin Lozen later on the same day, May 11, 2012, and was issued a "Notice/Record of Discussion."[89]  According to that document, Walker was required to remain on the first shift until management saw "improvement in [his] attitude and performance[,] which includes taking responsibility and ownership in [his] job duties and actions [and] working as a productive employee with the other employees on both shifts."[90]  Human Resources Manager Kyle Lausee took notes during the meeting and later recorded the following summary of events:

> After I read the [R]ecord of Discussion[, Jeffrey Walker] became very argumentative[,] saying that he was not going to sign this[, and] that Don Neal was out to get him.  He kept on trying to blame others but could not give name to his issues. . . .  [H]e was creating a disturbance in the work force and when he kept [interrupting Plant Manager] Kevin Lozen and myself[,] cutting us off when we were trying to speak to him that that

---

[87] Doc. no. 27-2 (Defendant's Exhibit "A(13)" (2011 Performance Review)) (alterations supplied).

[88] *See* doc. no. 32-1 (Walker Affidavit), ¶ 40 (alteration supplied); *see also* doc. no. 27-9 (Defendant's Exhibit "E" (Lausee Deposition)), at 98.

[89] Doc. no. 27-10 (Defendant's Exhibit "E(17)" (May 2, 2012 Notice/Record of Discussion)).

[90] *Id.* (alterations supplied).

was insubordination[,] Jeffrey kept getting louder and more aggressive in his actions and [attitude]. . . .  [B]efore Jeffrey said any more[,] as he was mad and reaching the level of yelling[,] Kevin Lozen decided to suspend Jeffrey with pay for the rest of the day so that Jeffrey could cool down[.]  We told Jeffrey that we would contact him when he could return to work.

Doc. no. 27-10 (Defendant's Exhibit "E(16)" (May 11, 2012 "Notes on Jeffrey Walker")) (alterations supplied).

Neal, Lausee, and Lozen threatened Walker during the meeting, standing over him, and telling him that he would be fired if he did not sign the "Notice/Record of Discussion."[91]  Walker stated that the notice and his poor annual performance evaluation "were retaliation for [his] complaints of race discrimination."[92]  Walker quietly answered their questions, and was sent home, but his pay was not docked.[93]

## L.    Walker's Second, May 11, 2012, "MySafeWorkplace" Complaint

Walker lodged a second complaint on the "MySafeWorkplace" website later on that same day, May 11, 2012.  He complained about his annual performance evaluation, the "Notice/Record of Discussion," and the tenor of the related meeting with Neal, Lausee, and Lozen.[94]  He wrote that, in each of those instances, "Schwarze

---

[91] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 350.

[92] Doc. no. 32-1 (Walker Affidavit), ¶ 39 (alteration supplied).

[93] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 350–52.

[94] Doc. no. 32-1 (Walker Affidavit), ¶ 41; doc. no. 27-4 (Defendant's Exhibit "B(4)" ("Talk To Your Organization")).

Industries ha[d] exhibited discrimination and retaliation."[95]

## M.    May 15, 2012 Demotion

Four days after Walker's meeting with Neal, Lausee, and Lozen, he received a telephone call directing him to return to work.[96]  When he arrived at the plant, Neal issued him another "Notice/Record of Discussion" stating that Walker had been demoted from his leadman position.  The pertinent portions read as follows:

> Jeffrey[,] you were brought to Human Resources' office today (5-15-12) on some issues with your performance as an employee and a Lead in the [fabrication] department.  Alamo Group has policies, processes and procedures that must be followed by individuals in lead positions.  You have violated Alamo policies such as code of conduct when you blame others for everything that goes wrong.  You have become very aggressive and argumentative when you are being addressed with issues that need improvement.  You have not been following chain of command when addressing issues[,] which does not follow our Complaint Procedure.  You have been insubordinate while showing disrespect to the Plant [M]anager and HR [M]anager by interrupting as we try to go over corrective issues that need to be addressed[.  T]his is another violation of company policy [and] a terminable offense.

> Jeffrey[,] due to your actions you have been creating a hostile and volatile work environment[,] and [this] needs to stop.  We have been trying to work with you to correct this, but your defiant actions have been getting in the way of progress.

> . . . .

> Kevin Lozen and I have gone over with you in detail the problems

---

[95] Doc. no. 27-4 (Defendant's Exhibit "B(4)" ("Talk To Your Organization")) (alteration supplied).

[96] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 352.

that are occurring, [and] many are stated in the above details.  This Record of Discussion is to confirm that you will remain on 1ˢᵗ shift and that you will no longer be in a lead position.  This has officially happened Monday[,] May 14, 2012.  We need to see improvement in your attitude and work ethic.  We are placing you on a 6 month probation period. . . .

Doc. no. 27-2 (Defendant's Exhibit "A(15)" (May 15, 2012 Notice/Record of Discussion)) (alterations supplied).

Walker refused to sign the notice, and was told that he could not write comments on it.[97]

As a result of the demotion, Walker lost his lead pay and "the shift deferential [he] had been receiving on second shift."[98]

## N.    Walker's June 11, 2012 EEOC Complaint

Walker filed a formal "Charge of Discrimination" with the Equal Employment Opportunity Commission on June 11, 2012.[99]  The EEOC notified Schwarze of Walker's charge in a document dated June 15, 2012.[100]

## O.    June 26, 2012 Incident and Resulting Complaints

Neal "was very critical" of Walker during the month of June.  He "would act

---

[97] *Id.* at 356–57.

[98] Doc. no. 32-1 (Walker Affidavit), ¶ 44 (alteration supplied).

[99] *Id.* ¶ 45; doc. no. 27-2 (Defendant's Exhibit "A(17)" (Charge of Discrimination)).

[100] Doc. no. 27-2 (Defendant's Exhibit "A(18)" (Notice of Charge of Discriminaton)).

extraordinarily angry and yell" when Walker asked questions.[101]  For example, when Walker asked about cross-training on June 26, 2012, Neal yelled and pointed his finger at him.[102]  Walker addressed an e-mail about the incident to Human Resources Manager Kyle Lausee later that same day, and complained that Neal "continues to create [an] uncomfortable, hostil[e,] and harassing environment."[103]

Walker lodged a third complaint on the "MySafeWorkplace" website that same day, June 26, 2012, in which he described the incident with Neal and complained that, even though he had submitted his first complaint to "MySafeWorkplace" nearly two months before, *i.e.*, on May 7, 2012, "no one from the [Alamo Group] corporate office ha[d] contacted [him] or provided a status of the investigation[,] [but] the harassment [was] continuing."[104]

Walker transmitted an e-mail to Alamo Group corporate attorney Donald Duncan on the same day, June 26, 2012, complaining about "harassment, a hostile work environment[, and] less favorable treatment than other employees."[105]  He asked Duncan "to investigate the unfair and unethical practices at this [Huntsville]

---

[101] Doc. no. 32-1 (Walker Affidavit), ¶ 46.

[102] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 365–67.

[103] Doc. no. 27-2 (Defendant's Exhibit "A(19)" (June 26, 2012 E-mail to Kyle Lausee)) (alterations supplied).

[104] Doc. no. 27-4 (Defendant's Exhibit "B(5)" (June 26, 2012 Complaint to MySafeWorkplace)) (alterations supplied); doc. no. 32-1 (Walker Affidavit), ¶ 48.

[105] Doc. no. 27-4 (Defendant's Exhibit "B(6)" (June 26–27, 2012 E-mail Exchange Between Jeffrey Walker and Donald Duncan)), at 3 (alteration supplied).

location."[106]  Duncan responded later that same day, writing that an investigation into the complaints that Walker had lodged with "MySafeWorkplace" and the EEOC was "ongoing," but he also encouraged Walker to "work out" his issues with "supervisors and local management."[107]

## P.   Kyle Lausee's Investigations of Walker's Complaints

Schwarze's Human Resources Manager Kyle Lausee interviewed eight employees about the June 26, 2012 incident between Walker and Neal, described in Part II.O, *supra*.  He asked each employee the same questions: *i.e.*,

1.   Did Don Neal become very [irate and] point his finger in the air waving it around?

2.   Did Don Neal yell or raise his voice to Jeffrey Walker?

3.   Was Don Verbally abusive to Jeffrey Walker?

4.   Did Don verbally go after Jeffrey Walker?

Doc. no. 27-10 (Defendant's Exhibit "E(26)" (Lausee Investigation Results)), at ECF 63 (alteration supplied).[108]

---

[106] *Id.* (alteration supplied).

[107] *Id.* at 2.

[108] The employees' responses, recorded by Lausee but signed by the employees, were attached to the Records of Discussion.  *See* doc. no. 27-2 (Defendant's Exhibit "A(21)" (Notices/Records of Discussion)).  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to

Four of the eight employees interviewed by Lausee were African-American (*i.e.*, Robert Brandon, Calvin Doss, Victor Garner, and Doug Hall), and the remaining four were white (*i.e.*, William Harris, Ivan Hutto, Jerry Lausdell, and Tony Payne).[109] All eight employees, regardless of race, answered each question the same way: "No."[110]

Lausee recorded the results of his investigation in a "Notice/Record of Discussion" addressed to Walker and dated July 9, 2012.  He wrote that he found no evidence to support Walker's allegations that Neal had yelled and pointed his finger at Walker, had verbally attacked Walker, or had raised his voice when speaking to Walker.[111]

## Q.    Alamo Group Investigation of Walker's Complaints

At some point on either June 26 or 27, 2012, Donald Duncan transmitted an e-mail to Walker, summarizing his understanding of Walker's allegations:  that is, Neal had "tried to punish [him] and get back at [him]" for refusing to argue against reinstating the second shift, and Neal's retaliation had consisted of:  asking Walker to

---

ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[109] Doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 25.

[110] *See* doc. no. 27-10 (Defendant's Exhibit "E(26)" (Lausee Investigation Results)) .

[111] Doc. no. 27-2 (Defendant's Exhibit "A(21)" (Notices/Records of Discussion)).

work on a Saturday that he had planned to move his daughter into her college dorm; giving other employees overtime without asking Walker whether he desired to work the extra hours; giving Walker a poor annual performance evaluation in May of 2012; moving Walker from the second to the first shift; and, demoting Walker from his lead position.[112]

Walker responded to Duncan's summary by adding a few details, but he did not contradict the substance of Duncan's summary of his allegations, *or* lodge any additional claims.  Significantly, Walker did not dispute Duncan's understanding of the alleged motivation for Neal's retaliatory actions:  *i.e.*, that Walker had refused to argue against reinstating the second shift.[113]

Gabriela Garcia — who is Hispanic, and who was, at the time, the senior Alamo Group human resources official — investigated Walker's complaints at Schwarze's Huntsville plant on July 2 and 3, 2012.[114]  She met with Walker and interviewed several Schwarze employees, some of whom were African-American.[115]  Garcia asked several employees whether workers on the first and second shifts had communication problems.[116]  Ivan Hutto (white) responded that Walker had an attitude of "not

---

[112]  Doc. no. 27-4 (Defendant's Exhibit "B(6)" (June 26, 2012 E-mail Exchange Between Jeffrey Walker and Donald Duncan)), at 2 (alterations supplied).

[113] *Id.*

[114]  Doc. no. 27-3 (Defendant's Exhibit "B" (Garcia Deposition)), at 9, 39, 50.

[115] *Id.*

[116] Doc. no. 27-2 (Defendant's Exhibit "A(20)" (Notes Dated July 2, 2012 and July 3, 2012)).

wanting to be here," and that he often was difficult to find.[117]  Williams Harris (white) said that it was difficult to talk to Walker, and that Walker "never" talked to other employees, including other leads.[118]  Chris Moore (African-American) said that Walker was "quick to point fingers" at other persons.[119]

Garcia asked several employees about overtime policies, and each told her essentially the same thing.  For example, Ivan Hutto (white) told her that it was allocated based on an employee's ability to run the machines required for performance of the overtime work.[120]  John Gusich (white) said that overtime was based on an employee's job classification, and that those who were not qualified to operate the machines needed during overtime shifts would not be offered overtime.[121]  Chris Moore (African-American) said that overtime "is based on needs and tasks that need to be done."[122]  William Harris (white) added that Walker "wants the overtime when he wants it and not when it is available," but even so, Neal "tried to work with him."[123]

---

[117] *Id.* at ECF 59.

[118] *Id.* at ECF 60.

[119] *Id.* at ECF 61.

[120] *Id.* at ECF 59.

[121] Doc. no. 27-2 (Defendant's Exhibit "A(20)" (Notes Dated July 2, 2012 and July 3, 2012)), at ECF 64.

[122] *Id.* at ECF 60.

[123] *Id.*

Garcia asked some of the employees whether they had ever been "written up" for poor performance.  William Harris (white) replied that Neal usually issued "write ups" only when an employee makes a costly mistake.[124]  Arthur Grant (African-American) said that, "right now everyone is getting a taste of getting written up on quality and safety."[125]  John Gusich (white) said that he was written up the first time he built something backwards, and that when employees committed errors, they received write ups.[126]

When Garcia asked about discrimination, Chris Moore (African-American) responded that he was not aware of any.[127]  Victor Garner (African-American) said that Neal treats everyone fairly.[128]  John Gusich (white) said that Neal was "straight across the board."[129]  But Arthur Grant (African American) said that he "[w]ouldn't say" that some leads were not treated differently or discriminated against.[130]  Victor Garner (African-American) explained the June 26, 2012 incident between Walker and Neal, recalling that "Don was raising his voice[,] but it was with everyone there

---

[124] *Id.*

[125] *Id.* at ECF 62.

[126] *Id.* at ECF 64.

[127] Doc. no. 27-2 (Defendant's Exhibit "A(20)" (Notes Dated July 2, 2012 and July 3, 2012)), at ECF 61.

[128] *Id.* at ECF 62.

[129] *Id.* at ECF 64.

[130] *Id.* at ECF 62 (alteration supplied).

because the fans were loud."[131]

In her meeting with Walker, Garcia refused his request to view the video of the June 26, 2012 incident, explaining that she did not have enough time.[132]

The results of Garcia's investigation, as well as the results of Lausee's investigation of the June 26, 2012 incident, were recorded in a "Record of Discussion" dated July 3, 2012.[133]   Garcia found no foundation for Walker's complaint that overtime was assigned unfairly, or that he was treated unfairly compared to other leads, or that Neal "became irate [and] beg[a]n yelling and pointing his finger" at Walker on June 26, 2012.[134]   Garcia concluded that "it cannot be determined that unfair treatment [or] retaliation is being made toward [Jeffrey] Walker.  We are considering the matter closed."[135]   Walker refused to sign the record of his discussion with Garcia.[136]

**R.     July 2012 Incidents**

Don Neal, Kyle Lausee, and Kevin Lozen issued a "Notice of Disciplinary Action" to Walker on July 11, 2012.  The document faulted Walker for incidents that

---

[131] *Id.* (alteration supplied).

[132] Doc. no. 32-1 (Walker Affidavit), ¶ 51.

[133] Doc. no. 27-4 (Defendant's Exhibit "B(9)" (July 3, 2012 Notice/Record of Discussion)).

[134] *Id.* (alterations supplied).

[135] *Id.* (alterations supplied).

[136] *Id.*

occurred on June 28 and 29, 2012, when Walker allegedly rolled two parts incorrectly, costing the company nearly two hundred dollars.[137]

> Per company policy[,] this is the 3rd disciplinary action since October 2011 and normally would be grounds for a 3 day suspension and drug test. However[,] we are moving this back to a written warning with drug test to make sure you are clear as to the severity of your recent actions. More infractions will lead to disciplinary actions up to and including termination.

Doc. no. 27-2 (Defendant's Exhibit "A(22)" (July 11, 2012 Notice of Disciplinary Action)) (alterations supplied).  Walker refused to sign the notice, claiming that he was not at fault, and alleged retaliation.[138]

Later that same day, Walker addressed an e-mail to Kyle Lausee, complaining that the notice of disciplinary action amounted to "retaliation and harassment by Don Neal and Kevin [Lozen]."[139]

## S.    Confrontation Between Kevin Lozen and Jeffrey Walker

The following day, July 12, 2012, Walker told other employees in the fabrication department that he "could not answer any questions they might have" because he was afraid that his supervisor, Don Neal, and Plant Manager Kevin Lozen

---

[137] Doc. no. 27-2 (Defendant's Exhibit "A(22)" (July 11, 2012 Notice of Disciplinary Action)).

[138] *Id.*

[139] Doc. no. 27-10 (Defendant's Exhibit "E(30)" (July 11, 2012 E-mail to Kyle Lausee)) (alteration supplied).

"would try to come up with new reasons to give [him] discipline."[140]   When Lozen

learned about Walker's comments, he confronted him.  According to Walker, Lozen

"cornered" him at his work station,[141] and was "hostile and aggressive and yelling,"[142]

thereby making him feel threatened.[143]   Walker alleged that Lozen pushed him on the

shoulder, "hard enough for [his] shoulder to flinch."[144]   Walker repeatedly asked:

"Kevin, why are you touching me?"; and "Why did you do that to me?"  As Lozen

walked away, Walker shouted  "You have assaulted me."[145]

Walker reported the incident to Human Resources Manager Kyle Lausee, who

refused to "document a complaint."[146]   Walker became visibly upset, and Lausee

called Walker's wife, who in turn called the Huntsville Police Department.[147]  Walker

was sent home and suspended with pay until an investigation could be completed, but

no disciplinary action was taken against Lozen.[148]

---

[140] Doc. no. 32-1 (Walker Affidavit), ¶ 57 (alteration supplied).

[141] *Id.* ¶ 58.

[142] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 428.

[143] Doc. no. 32-1 (Walker Affidavit), ¶ 58.  Lozen notes in his deposition that the fabrication department is loud because machines are running and that employees wear hearing protection.  Doc. no. 27-7 (Defendant's Exhibit "D" (Lozen Deposition)), at 84.

[144] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 426–28 (alteration supplied).

[145] Doc. no. 27-7 (Defendant's Exhibit "D" (Lozen Deposition)), at 85.

[146] Doc. no. 32-1 (Walker Affidavit), ¶ 60.

[147] *Id.*

[148] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 462–63.

Within two hours of the incident, Walker filed a police report, which included a statement that Lozen had "pushed [him] on the shoulder."[149]  Later that same day, he wrote the EEOC, described the incident, complained that his rights were "being totally violated," and alleged that he felt "imprisoned" in his workplace.[150]  Walker also filed a complaint about the alleged assault with Alamo Group corporate headquarters.[151]

The police conducted an investigation of Walker's allegation.  Investigators reviewed a video recording of the incident and interviewed Schwarze employees.[152]  Lozen was not charged with a criminal offense, however, because the video indicated that Lozen "had his hands up in a ninety-degree position" when talking to Walker.[153]  An investigating officer told Lozen that he "did not see any problems, did not see any crime, did not see anything wrong."[154]

## T.    Walker's Termination

A panel of three Alamo Group employees— Gabriela Garcia, Donald Duncan,

---

[149]  Doc. no. 27-2 (Defendant's Exhibit "A(23)" ("Alabama Uniform Incident/Offense Report" and "Statement of Witness")) (alteration supplied).

[150]  *Id.* (Defendant's Exhibit "A(24)" (July 12, 2012 Letter to Antwan Matthews)).

[151]  Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 463.

[152]  *Id.* at 449–50.

[153]  *Id.*  The court reviewed the video in question and found that Lozen's right arm was indeed bent at a ninety-degree angle during the times when he was close to Walker.  It was unclear, however, whether there was contact between Lozen and Walker.  Doc. no. 27-2 (Defendant's Exhibit "A(28)" (Video Recording of July 12, 2012 Incident)).

[154]  Doc. no. 27-7 (Defendant's Exhibit "D" (Lozen Deposition)), at 89.

and Jeff Leonard (an "Executive Vice President" of an undisclosed industrial department) — convened in Donald Duncan's office at Alamo Group headquarters on July 30, 2012, for the purpose of reviewing Walker's employment status.[155]  The panel reviewed a "fact packet" prepared by Kyle Lausee which contained "Walker's complaints, items from his personnel file, his disciplinary actions, [Garcia's] investigation notes, . . . an outside attorney's investigation notes [of the July 12, 2012 incident involving Lozen], [and] police reports."[156]  The panel wrote the following memorandum addressed to Alamo Group Vice President of Administration Bob George:

> There have been continuing conflicts between Walker and Neal since mid 2011.  Walker has filed several internal complaints with Huntsville management and one corporate level complaint through [MySafeWorkplace]. Huntsville management has responded to Walker's complaints by conducting investigations that were well documented in some cases and less well documented in others. . . .
>
> In each case where there were witnesses to Walker's allegations, those witnesses (including hourly and managerial employees) have contradicted Walker's version of events.  Our conclusion is that Walker has been less than truthful.
>
> Some of Walker's complaints contradict each other.  He made one complaint because Neal asked him to work overtime on a Saturday.  He told Neal he could not work because [he was helping his daughter move into college].  A few weeks later, Walker made another complaint

---

[155] Doc. no. 27-3 (Defendant's Exhibit "B" (Garcia Deposition)), at 62–63.

[156] Doc. no. 27-9 (Defendant's Exhibit "E" (Lausee Deposition)), at 130 (alterations supplied); *see also* doc. no. 27-3 (Defendant's Exhibit "B" (Garcia Deposition)), at 62–63.

because Neal did not ask him to work overtime — but the employee who was asked had skills that were better matched for the requirements needed that day.

Walker's complaints seem exaggerated.  He has complained on several occasions that routine workplace issues caused him to experience medical emergencies.  However, to date, Mr. Walker has not provided any medical restrictions to the Company from a qualified medical professional that restrict him from performing his essential job functions.

With these things in mind, we turn to the July 12, 2012 incident that led to Walker's current suspension with pay.  After an incident in the morning when Walker caused a disruption in work by loudly stating that he would not assist anyone with their assignments, later in the day Walker accused Plant Manager Kevin Lozen [of] physically assaulting him.  Walker made this allegation to three different places: (1) Huntsville HR, (2) corporate headquarters in Seguin, TX and (3) the Huntsville Police Department.  This allegation was taken seriously.  All three locations conducted investigations, with the corporate investigation being conducted by an outside attorney. . . . But after review [of] the video of the incident, all three independently came to the same conclusion: to the extent that there was any physical contact between Walker and Lozen, it was very light and inadvertent.

Walker has made a serious and intentionally false allegation about Kevin Lozen.  His conduct on July 12 disrupted the plant and interfered with the work of numerous employees, including his own work and the work of Kevin Lozen and others.

Walker's conduct on July 12 violated several rules of conduct, including interfering with the work of others, verbal abuse of other employees, making derogatory statements concerning employees, and making false statements.

We recommend unanimously that Walker's employment be terminated as soon as possible.  This recommendation is based on his conduct on July 12 as evaluated in light of his record of on the job conflicts, deteriorating performance, and making false allegations.

Doc. no. 27-2 (Defendant's Exhibit "A(26)" (Memo to Bob George)) (alterations supplied).   Schwarze fired Walker on August 2, 2012, with the preceding memorandum attached to the notice of termination.[157]

**U.**   **Dismissal of EEOC Investigation**

The EEOC issued a "Dismissal and Notice of Rights" on October 11, 2012, stating that the agency had terminated its investigation of Walker's charge of discrimination because it was unable to conclude that the information obtained established violations of the civil rights statutes.[158]  The document notified Walker of his right to file suit, and this action followed.[159]

**IV**.  **WALKER'S RACE DISCRIMINATION CLAIMS**

Walker's race discrimination claims are asserted under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., as well as 42 U.S.C. § 1981.[160]  "Both of these statutes have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The essential element under each statute is proof that the employer intentionally inflicted the adverse employment action complained of because of the

---

[157] Doc. no. 27-2 (Defendant's Exhibit "A(25)" (August 2, 2012 Notice of Disciplinary Action)).

[158] Doc. no. 8-2.

[159] *Id.*

[160] Doc. no. 1 (Complaint), ¶¶ 38–46.

plaintiff's race.  *See, e.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767 (11th Cir. 2005) (observing that disparate treatment claims based upon a plaintiff's race and "brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent").

Direct evidence of an employer's discriminatory intent usually is not available. *See, e.g.*, *Sheridan v. E.I. DuPont de Nemors & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996) (*en banc*).  That is true in this case.[161]  Thus, plaintiff bears the initial burden of establishing the employer's discriminatory intent through the use of circumstantial evidence.  *See Vessels*, 408 F.3d at 767.  Federal courts evaluate the sufficiency of such evidence using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also, e.g.*,  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2004) (*en banc*);  *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990).

Under that familiar framework, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination.  To rebut that

---

[161] Walker does not allege in his brief that there is any direct evidence of discriminatory intent.  *See* doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 30.

presumption, the employer must articulate a legitimate, nondiscriminatory reason for the contested employment action.  If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See, e.g.*, *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

The specific elements of a plaintiff's *prima facie* case generally vary with the nature of the adverse employment action that is complained of.  Here, Walker complains of four adverse employment actions:  denial of opportunities to earn overtime compensation; his negative performance evaluation; demotion; and termination of his employment.[162]  All but the first of those contested actions were inflicted as disciplinary sanctions.  Consequently, they are addressed together in the following discussion.

## A.    Disciplinary Sanctions

This Circuit applies the same *prima facie* elements to cases involving disciplinary sanctions.  The plaintiff must prove that:  he belongs to a protected class; he suffered an adverse employment action; he was qualified for the position he held; and his employer treated similarly situated employees outside his protected class more favorably.  *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir.

---

[162] Doc. no. 26 (Defendant's Summary Judgment Brief), at 17.  Importantly, Schwarze does not dispute that those four actions constitute adverse employment actions in this context.  *Id.*

2011); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006); *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).

As is often true in cases involving disciplinary sanctions, *see, e.g.*, *McCann*, 526 F.3d at 1373, only the fourth element is at issue here. To satisfy that element, the plaintiff must identify an employee outside his protected class who engaged in — or was accused of — similar misconduct, but was disciplined differently. *Burke-Fowler*, 447 F.3d at 1323 ("When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [courts] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." (alteration supplied)). The comparator's misconduct must be "nearly identical" to that of the plaintiff, so as "to prevent [the court] from second-guessing employers' reasonable decisions and confusing apples with oranges." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Maniccia*, 171 F.3d at 1368–69) (alteration supplied).

As a general matter, the comparators that Walker points to are "the other leads in the Fabrication Department, all of whom were white and all of whom were treated

41

better than Walker by Don Neal."[163]  Walker does not explain, however, how the other leads were treated more favorably with regard to each disciplinary sanction.  Instead, he argues that Neal's *generally* more favorable treatment of the white leads is "sufficient, if not rebutted, to create an inference of discrimination."[164]  Again, however, Walker's brief does not address how white employees at Schwarze were "disciplined in different ways" for "the same or similar conduct."  *Burke-Fowler*, 447 F.3d 1323.  Indeed, Walker *has not identified even one white employee* who engaged in similar conduct, but was treated differently with regard to the three disciplinary sanctions he suffered: *i.e.*, the negative performance evaluation, demotion, and termination.[165]  Simply put, with no evidence of misconduct by the white leads that resulted in less severe disciplinary sanctions, or no disciplinary action at all, the court cannot engage in a rational evaluation of this *prima facie* element.  Thus, Walker has failed to satisfy that element of a *prima facie* case for his negative performance review, demotion, and termination.

Even so, a plaintiff who fails to identify a comparator still may create a "triable issue concerning the employer's discriminatory intent" by showing a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

---

[163] Doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 32–33.

[164] *Id.* at 33.

[165] *See id.* at 32–33.

discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).   As the Eleventh Circuit observed in *Connelly v. Metropolitan Atlanta Rapid Transit Authority*, 764 F.3d 1358 (11th Cir. 2014), the plaintiff in *Smith* overcame his failure to identify a comparator by offering "compelling evidence of . . . numerous incidents where the discipline of white employees varied considerably from that of black employees, and a 'discipline matrix' created by the employer that tracked the discipline and race of employees." *Id.* at 1364 (some internal quotation marks omitted).   The plaintiff's evidence in *Smith* precluded summary judgment, at least in part, because it indicated clearly that the employer "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so."   *Smith*, 644 F.3d at 1341.

The evidence here is not nearly so probative of discrimination.   Although Walker has shown that, in several instances, Don Neal treated him less favorably than the white leads in his department,[166] he has not shown beyond mere speculation that there is any connection between Neal's actions and Walker's race.   *See id.* at 1328; *Marshall v. City of Cape Coral, Florida*, 797 F.2d 1555, 1559 (11th Cir. 1986) (holding that "inferences based upon speculation are not reasonable").   For example, even though Walker alleges that Neal never invited him to production meetings

---

[166] *See supra* Part II.A.

because of his race, he admits that another African-American lead *was invited* to the same meetings from which he was excluded.[167]  Moreover, *the only* minority employee for whom there is any evidence of unfavorable treatment by Neal is Walker.

Walker's circumstantial evidence, therefore, is not comparable to the evidence presented by the plaintiff in *Smith*, which indicated a clear connection between the employer's actions and the employee's race.  *See Connor v. Bell Microproducts-Future Tech, Inc.*, 492 F. App'x 963, 967 n.1 (11th Cir. 2012) (observing that the employee in *Smith* "presented evidence that his employer was particularly concerned with race[,] and all of the circumstantial evidence connected its employees' race to the employer's decision-making" (alteration supplied)).  Consequently, Walker has not presented a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination."  *Smith*, 644 F.3d at 1328.

Accordingly, this court concludes that summary judgment is due to be entered in favor of defendant on Walker's claims of a racially-discriminatory performance evaluation, demotion, and termination.

## B.    Denial of Overtime Opportunities

Walker also contends that he was denied voluntary overtime opportunities because of his race.  He has identified two white comparators, Tony Payne and James

---

[167] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 146.

Eaton, who were treated more favorably.[168]  Schwarze does not deny that Payne and

Eaton are proper comparators, or that Walker established a *prima facie* case.[169]

Instead, Schwarze contends that Walker was denied overtime opportunities because

he was not as qualified to operate the same machines that were used by Payne and

Eaton to perform the overtime work assigned to them.[170] Neal testified that Walker

"had no experience" on any machines other than the press brake and roller, whereas

Payne and Eaton could operate a roller, saw, and shear.[171] Schwarze met its burden of

coming forward with a non-discriminatory reason for the contested employment

action.

When examining an employer's proffered reasons, courts focus on the

*employer's* beliefs, rather than those of the employee.  *See Elrod v. Sears, Roebuck*

*& Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citing *Smith v. Papp Clinic, P.A.*, 808

F.2d 1449, 1452–53 (11th Cir. 1987)).  For that reason, Walker's assertion that he *was*

*qualified* to operate the same machinery as Payne and Eaton is not probative of *Neal's*

*beliefs*.[172]  Further, Walker acknowledged that Neal instructed him to train on the

roller and the saw when he was moved to the first shift: an admission that corroborates

---

[168] Doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 1.

[169] Doc. no. 26 (Defendant's Summary Judgment Brief), at 22.

[170] *Id.*

[171] Doc. no. 27-11 (Defendant's Exhibit "F" (Neal Declaration)), ¶ 4 (testifying that Walker was not qualified to operate as many machines as Tony Payne and James Eaton).

[172] *Id.* ¶¶ 4–6.

Neal's stated reason for not assigning more overtime to Walker.[173]  Moreover, Walker

has not produced any evidence casting doubt upon Neal's testimony that he did not

believe that Walker was qualified to operate the same machines as Tony Payne and

James Eaton.  Therefore, Walker has not demonstrated that the employer's stated

reason for the disparate treatment was pretextual.  Accordingly, the court finds that

summary judgment is due to be entered in favor of defendant on Walker's claim that

he was denied overtime opportunities because of his race.

## IV.  WALKER'S RETALIATION CLAIMS

Walker also alleges that Schwarze unlawfully retaliated against him for

"complain[ing] about race discrimination and fil[ing] a charge of discrimination [with

the EEOC]."[174]  He contends that Schwarze engaged in "a pattern of retaliatory

harassment[,] which included discipline, discharge, and other terms, conditions, and

privileges of employment in violation of Title VII," as well as § 1981.[175]

The elements of proof for a retaliation claim are the same under both Title VII

and § 1981.  *See, e.g.*, *Standard v. A.B.E.L.*, 161 F.3d at 1330.  When, as here, there

is no direct evidence of retaliation, courts again employ the burden-shifting analytical

---

[173] Doc. no. 32-1 (Walker Affidavit), ¶ 28; *see also* doc. no. 26 (Defendant's Summary Judgment Brief), at 22.  Neal's belief that Walker needed training on the roller is perhaps bolstered by Kevin Lozen's testimony that Walker once told him "I don't know anything about this roller." Doc. no. 27-7 (Defendant's Exhibit "D" (Lozen Deposition)), at 34.

[174] Doc. no. 1 (Complaint), ¶¶ 48, 54 (alterations supplied).

[175] *Id.* ¶¶ 49, 55 (alteration supplied).

framework articulated in *McDonnell Douglas* and *Burdine* to evaluate a plaintiff's circumstantial evidence of retaliation.  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that:  he engaged in statutorily protected activity; he suffered an adverse employment action; and there is a causal connection between the protected activity and the adverse employment action.  *See, e.g.*, *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  If the plaintiff does so, the employer must come forward with a legitimate, non-retaliatory reason for the adverse employment action.  *Holified v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  If the employer does so, the plaintiff then bears the burden of demonstrating that the employer's stated reason is merely a pretextual excuse for retaliation.  *Id.*

Title VII's Opposition Clause provides that an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3(a).  Title VII's Participation Clause provides that an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.* The Participation Clause protects "proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC."  *EEOC v.*

*Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

It is clear that Walker engaged in activity protected by both clauses. He filed a formal EEOC charge of discrimination, made several verbal and written complaints of discrimination and retaliation to Don Neal, Kevin Lozen, Gabriela Garcia, Kyle Lausee, Wes Bryant, Donald Duncan, and others, and he lodged formal complaints of discrimination and retaliation with "MySafeWorkplace" on several occasions. Indeed, Walker engaged in protected activity for the first time in April of 2011, and subsequently on more than a dozen occasions before his termination in August of 2012.[176]

## A.    Denial of Voluntary Overtime Opportunities

Walker testified in his deposition that Neal began "retaliating" against him by assigning fewer overtime shifts after Walker refused to argue against reinstatement of the second shift.[177]    Schwarze, therefore, contends that Walker's retaliation claim is not cognizable, because the adverse employment action was in retaliation for a non-protected activity.    Inexplicably, *Walker does not address this point, or the testimony in question, in his brief.*[178]    Walker's affidavit recounts having *told* Neal, Bryant, and Lausee on two occasions that he believed the overtime assignments were racially

---

[176] Doc. no. 32-1 (Walker Affidavit), ¶ 13.

[177] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 278–81.

[178] *See* doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 34–37.

discriminatory.[179] Even so, Walker's affidavit does not refute his deposition testimony that he believed that Neal denied him overtime opportunities in retaliation for his support of the reinstatement of the second shift.[180]  Having considered Walker's deposition testimony and other evidence,[181] the court similarly concludes that Walker attributes Neal's alleged retaliatory denial of overtime shifts to his support for reinstatement of the second shift:  a non-protected activity.  Accordingly, summary judgment is due to be entered in favor of Schwarze on this claim.

## B.    Negative Annual Performance Evaluation

Schwarze does not deny that Neal's negative annual performance evaluation of Walker on May 11, 2012 constituted an adverse employment action.[182]  Walker engaged in protected activity one month prior to the evaluation, on April 4, 2012, when he complained to Neal of discrimination and retaliation.[183]  The temporal proximity between the two events, coupled with evidence that the evaluation was

---

[179] Doc. no. 32-1 (Walker Affidavit), ¶¶ 13, 16-18.

[180] *See also* doc. no. 27-2 (Defendant's Exhibit "A(9)" (May 7, 2012 Letter to Ronald Robinson, *et al.*)) ("This actually all started last year when 2nd shift beg[a]n.  Mr. Don Neal was opposed to having a 2nd shift and tried to coerce me with my response to upper management regarding my opinion of beginning a 2nd shift.  Upper management approached me with the idea[] of starting the shift and requested me to take a position as lead.  I agreed and this was not favored by Don." (alterations supplied)).  Walker also did not dispute Donald Duncan's statement that Walker believed Neal was retaliating against him to "get back at [him]" for his support of the reinstatement of the second shift.  *See* doc. no. 27-4 (Defendant's Exhibit "B(6)" (June 26, 2012 E-mail Exchange Between Jeffrey Walker and Donald Duncan)), at 2.

[181] *See supra* note 180.

[182] *See* doc. no. 26 (Defendant's Summary Judgment Brief), at 28–29.

[183] Doc. no. 32-1 (Walker Affidavit), ¶ 22.

49

lower than any previous evaluation by Neal, is sufficient to satisfy the causal connection element of the *prima facie* case. *See Weaver v. Casa Gallardo*, 922 F.2d 1515, 1525 (11th Cir. 1991) (superseded by statute on other grounds) ("The pronounced increase in negative reviews and the careful scrutiny of Weaver's performance . . . is sufficient to establish a causal link.").

Schwarze contends that the evaluation merely reflected Walker's poor performance, as evidenced by the reprimand he was issued on April 4, 2012.[184]  In addition, Neal wrote on the evaluation form that Walker needed to work on his "communication skills" and his "negative attitude."[185]  Thus, Schwarze has met its burden of coming forward with an allegedly non-retaliatory reason for the contested employment action.

Walker argues in his brief, under the heading "Pretext for Intentional Discrimination," that he has demonstrated pretext because he has "disputed the underlying basis for any discipline at all," and because he "has alleged that Neal and Lozen, with assistance from Lausee, actively harassed him during these meetings and when he was trying to work."[186]  Those two statements encompass the entirety of

---

[184] Doc. no. 26 (Defendant's Summary Judgment Brief), at 21.

[185] Doc. no. 27-2 (Defendant's Exhibit "A(13)" (2011 Performance Review)).

[186] Doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 37.

Walker's pretext arguments for his retaliation claims.[187]

The court agrees with Schwarze that "Walker is apparently trying to demonstrate pretext by simply denying that he engaged in the misconduct for which Schwarze subjected him to adverse actions."[188]  The Eleventh Circuit has repeatedly held, however, that such an argument, standing alone, cannot prevent summary judgment. *See, e.g.*, *Stone & Webster Construction, Inc. v. U.S. Department of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012) ("Where an employee argues that he did not actually engage in misconduct, we have held that an employer may rebut this allegation by showing its good faith, honest belief that the employee violated a rule.") (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)); *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (holding that "an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"); *Bennett v. Chatham County Sheriff Department*, 315 F. App'x 152, 160–61 (11th Cir. 2008) (holding that a plaintiff's assertion that she was "innocent of the misconduct does not support a finding of pretext" when the employer had "reasonable grounds to believe that [plaintiff] had engaged in the charged misconduct) (citing *EEOC v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) and *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d

---

[187] *See id.* at 37–38.

[188] Doc. no. 36 (Defendant's Reply Brief), at 17.

1354, 1363 n.3 (11th Cir. 1999)) (alteration supplied).

Walker's second argument, — *i.e.*, that Neal, Lozen, and Lausee harassed him during meetings and at his work station, and that such conduct "create[s] a material issue of fact" — has some merit.[189] The Eleventh Circuit has held that evidence of a sudden increase in scrutiny and harassment from an employee's supervisors may be evidence of pretext.  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 921 (11th Cir. 1993).  Since that decision, however, the Eleventh Circuit has repeatedly said that, in order to show pretext, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted); *see also, e.g.*, *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994).  Therefore, evidence of the alleged "harassment" of Walker may *contribute to* a finding of pretext, but Walker still bears the burden of showing that each of Schwarze's proffered reasons is unworthy of credence.

---

[189] Doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 37 (alteration supplied).

As previously noted, when examining an employer's proffered reasons, courts focus on the *employer's beliefs*, rather than on those of the employee. *See Elrod*, 939 F.2d at 1470. In that regard, the record contains evidence that several Schwarze employees believed that Walker's communication skills were lacking, and that he had a negative attitude. For example, Ivan Hutto, William Harris, and Chris Moore told Gabriela Garcia during her investigation that Walker had communication problems, and that he often manifested a negative attitude.[190]

The record also contains evidence that several Schwarze employees believed that Walker exhibited poor performance during the shift mentioned in the April 4, 2012 reprimand. For example, John Gusich (the acting supervisor during the shift in question) and William Harris wrote in a "Team Member Relations Statement of Facts" that Walker had not accomplished much work during the shift at issue.[191] Don Neal testified that he came to the same conclusion after reviewing a video recording of the shift.[192] Moreover, Walker admits that he did not complete some of the parts he was

---

[190] Doc. no. 27-2 (Defendant's Exhibit "A(20)" (Notes Dated July 2, 2012 and July 3, 2012)), at ECF 59–61. Ivan Hutto also witnessed an incident involving Walker and James Eaton during which Walker "kept asking [James] the same questions," and that Eaton's poor reaction "was due to [Walker] repeating the same question." *See id.* (Defendant's Exhibit "A(3)"), at ECF 7 (alterations supplied).

[191] *Id.* (Defendant's Exhibit "A(11)" ("Team Member Relations: Statement of Facts)).

[192] Doc. no. 27-5 (Defendant's Exhibit "C" (Neal Deposition), at 167.

instructed to fabricate before the shift began.[193]

Walker contends that the document Schwarze filed as "Exhibit C(34)," in which Neal describes an occasion on which Walker demonstrated a negative attitude, contains inconsistencies.[194]  That document, allegedly written by Don Neal on April 18, 2012, describes how Walker, as lead on the second shift, had a negative outlook on his shift's ability to finish some parts.[195]  Neal's notes clearly indicate that Walker was speaking as lead *on the second shift* on April 18, 2012.[196]  Significantly, however, Walker had been moved to *the first shift* eight days earlier, on April 10, 2012.[197]  Thus, Schwarze's only documentation of *Neal's* belief that Walker had a negative attitude contains a glaring inconsistency.  *See Elrod*, 939 F.2d at 1470 (focusing its pretext analysis on the *decisionmaker's* beliefs).  That inconsistency, together with the fact that Walker's three previous annual performance evaluations were not only higher, but were trending higher each year, creates a genuine issue of material fact as to whether Neal's stated reasons for issuing a negative annual performance evaluation to Walker

---

[193] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 301–02.  Walker testified that he could not complete the part because of a defect in a machine.  *Id.*

[194] Doc. no. 27-6 (Defendant's Exhibit "C(34)" (Notes Taken by Don Neal)); doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 16, ¶ 23.

[195] Doc. no. 27-6 (Defendant's Exhibit "C(34)" (Notes Taken by Don Neal)).

[196] *Id.*

[197] Doc. no. 32-1 (Walker Affidavit), ¶ 26.

were pretextual.[198]   Summary judgment on this claim, therefore, is due to be denied.

## C.    Demotion

It is not disputed that Walker's May 14, 2012 demotion was an adverse employment action.  Walker complained to Neal of discrimination and retaliation just three days earlier.  Consequently, Walker has established a *prima facie* case of retaliation.  The notice that Neal issued to Walker, explaining the demotion, recited that Walker:  had violated the Alamo Group's code of conduct by "blaming others for everything that goes wrong"; had failed to follow proper chain-of-command procedures when filing complaints; had become "very aggressive and argumentative" when criticized; had been insubordinate; and had created a "hostile and volatile work environment."[199]  Those statements meet Schwarze's burden of producing legitimate, non-retaliatory reasons for demoting Walker.

Walker has not demonstrated inconsistencies in Schwarze's stated reasons.  A search of his brief, affidavit, deposition, and complaint reveals no allegations that demonstrate such inconsistencies.[200]  On the other hand, the record shows that, on

---

[198] Indeed, Walker's score reflected a drop of twenty-five percent (25%) from his previous score.  *Compare* doc. no. 27-6 (Defendant's Exhibit "C(20)" (2010 Performance Evaluation)), *with* doc. no. 27-2 (Defendant's Exhibit "A(13)" (2011 Performance Evaluation)).

[199] Doc. no. 27-2 (Defendant's Exhibit "A(15)" (May 15, 2012 Notice/Record of Discussion)).

[200] Walker did not discuss Alamo Group's code of conduct or its complaint procedures, nor did he provide copies for the court to review.

several occasions in which Walker was disciplined, he attempted to shift blame to others.[201]  Further, Kyle Lausee documented at least one occasion prior to May 14, 2012, on which he believed that Walker had been insubordinate.[202]

Accordingly, Walker has not demonstrated that his demotion was retaliatory under either Title VII or § 1981, and summary judgment is due to be entered in favor of defendant on that claim.

## D.    Termination

Termination of a person's employment is the "classic and ultimate 'tangible employment action.'" *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (citation omitted).  Walker engaged in protected activity when he filed an EEOC charge for discrimination.[203]  It is undisputed that Schwarze was aware of the protected activity on or around June 15, 2012.[204]  Walker also engaged in protected activity on June 26, 2012, when he lodged complaints of harassment and a hostile work environment to "MySafeWorkplace" and to Donald Duncan.[205] Walker was terminated on August 2, 2012, just over one month after he last engaged in

---

[201] *See, e.g.*, doc. no. 27-6 (Defendant's Exhibit "C(12)" (Walker's Comments on October 9, 2008 Reprimand)); *see also id.* (Defendant's Exhibit "C(15)" (March 27, 2009 Reprimand)).

[202] *See, e.g.*, doc. no. 27-2 (Defendant's Exhibit "A(14)" (Lausee's Notes on May 11, 2012 Meeting)).

[203] Doc. no. 26 (Defendant's Summary Judgment Brief), at 24.

[204] *Id.*

[205] *See* doc. no. 27-4 (Defendant's Exhibit "B(5)"("Talk To Your Organization)).

protected activity.[206]  That close temporal proximity between his protected activity and subsequent termination, viewed in the light of all other evidence, satisfies the causal link element of the *prima facie* case under Title VII and § 1981.

Gabriela Garcia, Donald Duncan, and Jeff Leonard recommended Walker's termination for several reasons, all listed in the memorandum attached to Walker's notice of termination that is quoted in Part II.T., *supra*.  Those statements satisfy Schwarze's burden of proffering legitimate, non-retaliatory reasons for terminating Walker.

Once again, Walker's brief does not address Schwarze's stated reasons for his termination.[207]  The court has reviewed his complaint, affidavit, deposition, and brief for any factual allegations tending to show that Schwarze's stated reasons are merely pretext for retaliation and found none.  Moreover, an employer who terminates an employee based on its good faith belief that the employee engaged in misconduct has not violated Title VII or § 1981.  *See, e.g., E.E.O.C. v. Total System Services, Inc.*, 221

---

[206] Doc. no. 27-2 (Defendant's Exhibit "A(25)" (August 2, 2012 Notice of Employment Separation)).  Neither party mentions the potential issues concerning *who* made the final decision to terminate Walker, including what impact, if any, Alamo Group's corporate relationship with Schwarze has on the analysis.  A review of Schwarze's briefs revealed that the company is operating under the assumption that Duncan, Garcia, and Leonard were responsible for terminating Walker, and that their reasoning and actions may fairly be attributable to Schwarze.  The court will continue under the same assumption.

[207] Granted, Walker also argued that Neal, Lozen, and Lausee "harassing" him was evidence of pretext.  *See* doc. no. 31 (Plaintiff's Response to Summary Judgment Motion), at 37.  Walker failed to address how the behavior of those three men makes the reasons cited by *the panel* unworthy of credence, however.  *See id.*

F.3d at 1176–77 (holding that plaintiff failed to show pretext when she failed to show that "[d]efendant lacked a good faith belief that [plaintiff] lied" (alterations supplied)); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d at 1363 n.3  (noting that an employer "who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct"); *Smith v. Papp Clinic, PA*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, . . . the employer has not violated § 1981" (alteration supplied)).

The panel's principal reason for terminating Walker was that he made an "intentionally false" allegation against Kevin Lozen.[208]  In reaching that conclusion, the panel consulted the results of investigations conducted by Alamo Group, the Huntsville Police Department, and an outside attorney.   All investigators independently reached the same conclusion:  if Lozen touched Walker at all, the contact was light and inadvertent.[209]  The panel reviewed a video recording of the incident — a recording that this court also has viewed — and that recording *clearly* supports the findings of the three investigations.  In short, it simply cannot be argued that the panel *did not believe* that Walker had made an intentionally false allegation,

---

[208] Doc. no. 27-2 (Defendant's Exhibit "A(26)" (Memo to Bob George)).

[209] *Id.*

in light of the unequivocally clear video evidence and the results of three independent investigations.

Walker testified in deposition that Lozen fully extended his arm when pushing on the shoulder,[210] whereas the video recording clearly shows that Lozen's arm was never close to being fully extended when he was near Walker.[211]

The panel also observed that, whenever other persons witnessed incidents that Walker complained of, "those witnesses (including hourly and managerial employees) . . . contradicted Walker's version of events."[212]  As a result, the panel concluded that "Walker ha[d] been less than truthful."[213]

Walker has presented no evidence suggesting that the panel did not in good faith believe that he engaged in misconduct by lodging untruthful complaints.

The panel also stated that Walker was disruptive on July 12, 2012, when he announced to other workers that he would not be helping them any longer, and when he accused Lozen of assaulting him.  Again, Walker has not presented any evidence that the panel did not, in good faith, believe that he was disruptive in those instances.

Accordingly, summary judgment is due to be entered in favor of defendant on

---

[210] Doc. no. 27-1 (Defendant's Exhibit "A" (Walker Deposition)), at 428.

[211] *See* doc. no. 27-2 (Defendant's Exhibit "A(28)" (Video Recording of July 12, 2012 Incident)).

[212] *Id.* (Defendant's Exhibit "A(26)" (Memo to Bob George)).

[213] *Id.* (alteration supplied).

Walker's retaliatory termination claim.

## V.  WALKER'S RETALIATORY HOSTILE WORK ENVIRONMENT CLAIM

Schwarze's reply brief contends that Walker attempted to "raise a new claim" for a hostile work environment in his response brief.[214]  Walker's complaint does not specifically mention "hostile work environment."  Instead, that pleading is divided into four counts of discrimination and retaliation under Title VII and § 1981.[215]  The retaliation counts contain an allegation that Schwarze "discriminated against [Walker] on the basis of retaliation by beginning a pattern of retaliatory harassment."[216]  Though poorly worded, that statement arguably alleges a claim that Schwarze created a hostile work environment in retaliation for Walker's protected conduct.

The Eleventh Circuit recently recognized a cause of action for retaliatory hostile work environment under Title VII which can be established with evidence that an employer's actions "were sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action." *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (*per curiam*).  In other words, when evaluating whether an employer's actions constitute an "adverse employment action" within the context of a claim of retaliatory hostile work environment, courts do not

---

[214] Doc. no. 36 (Defendant's Reply Brief), at 19.

[215] Doc. no. 1 (Complaint), ¶¶ 38–58.

[216] *Id.* ¶¶ 49, 55 (alteration supplied).

employ the standard typical of retaliation claims — *i.e.*, whether the employer's actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See, e.g.*, *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).  Instead, courts apply the "severe or pervasive" standard typical of hostile work environment claims.  *See, e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Schwarze argues that the alleged harassment, which included "discipline, discharge, and other terms, conditions, and privileges," was already "addressed in Schwarze's motion for summary judgment."[217]  It is true that Schwarze addressed four alleged adverse employment actions, individually, in its summary judgment brief. Schwarze ignores, however, the principle that the question of "whether an environment is hostile or abusive can be determined only by looking *at all the circumstances*." *Id.* (emphasis supplied, internal quotation marks omitted).  Schwarze has only addressed four, discrete adverse employment actions, rather than "all the circumstances" in the aggregate.  Moreover, when

> evaluating the objective severity of the harassment, [courts] look[] at the totality of the circumstances and consider[], among other things: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

---

[217] Doc. no. 36 (Defendant's Reply Brief), at 19.

*Gowski*, 682 F.3d at 1312 (citing *Harris*, 510 U.S. at 23) (alterations supplied, internal

quotation marks omitted).  Schwarze's brief did not address any of these factors.

This court has reviewed the record, however, and finds that it shows that

Walker has, at the very least, created a genuine issue of material fact as to whether the

actions of Don Neal and Kevin Lozen "were sufficiently severe or pervasive to alter

the terms and conditions of [Walker's] employment." *Id.* (alteration supplied).  In the

span of less than one year, Walker was subjected to more than a dozen disciplinary

actions, including several suspensions and disciplinary notices, periods of probation,

a poor performance review, reductions in pay, demotion, reassignment, and

termination, as well as several instances of aggressive, intimidating, and physically

threatening behavior by Neal and Lozen.  Even though some of those actions did not,

individually, constitute an adverse employment action in the context of a retaliatory

hostile work environment claim, when they are considered in the aggregate, a

reasonable jury could conclude that they were sufficiently severe or pervasive as to

alter the terms of Walker's employment. *Id.*  Accordingly, the motion for summary

judgment as to Walker's retaliatory hostile work environment claim is due to be

denied.

## VI.  CONCLUSION AND ORDERS

In accordance with the foregoing, the motion to strike portions of plaintiff's

opposition affidavit is DENIED.  The motion for summary judgment filed by defendant Schwarze Industries, Inc., is due to be GRANTED in part and DENIED in part.  Plaintiff Jeffrey Walker's Title VII and § 1981 claims for discrimination are DISMISSED with prejudice.  The motion as to plaintiff's claims for retaliation pursuant to Title VII and § 1981 is GRANTED in part and DENIED in part.  The motion as to the negative performance review is DENIED.  The motion as to all other adverse employment actions is GRANTED, and those claims are DISMISSED with prejudice.  The motion as to plaintiff's claim for retaliatory hostile work environment pursuant to Title VII is DENIED.  All remaining claims will be set for pretrial conference by separate order.

DONE and ORDERED this 12th day of November, 2014.

_____
United States District Judge